**KAZDY–REICH v. MARSHALL, Secretary of State.**

**Civ. A. No. 2748–48.**

United States District Court
District of Columbia.

Jan. 9, 1950.

Irvin Goldstein, Edward J. Hayes, Washington, D. C., for plaintiff.

George Morris Fay, United States Attorney, Ross O'Donoghue, Assistant United States Attorney, Washington, D. C., for defendant.

MATTHEWS, District Judge.

Plaintiff brought this action for a judgment declaring that she is a citizen of the United States. The action was defended on the ground that plaintiff expatriated herself under Section 401 (e) of the Nationality Act of 1940, 8 U.S.C.A. § 801(e), by voting in a national election in Hungary. Plaintiff was a native-born citizen of the United States. In 1925 she married a Hungarian, and they resided in the United States until 1935 except for a visit to Hungary of several months. In 1935 they again went to Hungary and were there when the war broke out. Hungary called plaintiff's husband for military duty and plaintiff remained in Hungary. In January 1945 Hungary signed an armistice with the United States, Russia and Great Britain. An Allied Control Commission was set up in Hungary, but the military personnel there of the United States and Great Britain numbered several hundred, while that of Russia totalled nearly a million. Thereafter in November 1945 the Provisional Government of Hungary held a national election, the voting being by secret ballot. The United States had an official observer of the conduct of this election, and deeming it a free election the United States established diplomatic relations with the Hungarian Government. The plaintiff voted in the election, but contends she acted under coercion and fear, and not in the exercise of her free will.

Plaintiff claims that her husband was well known for his opposition to Communists and that following the armistice plaintiff and her husband were afraid of the Communists then occupying Hungary and that his life was in danger. She testified that in the summer of 1945 there was publicity urging the people to vote in the national election in November; that there was posted in the lobby of the building where plaintiff and her husband resided two lists —one of eligible voters and one of nonvoters; that to plaintiff's surprise her name was on the list of eligible voters; that the list of nonvoters included criminals, Nazis and undesirables; that it was dangerous to be on the nonvoters list as persons listed thereon were subject to arrest, imprisonment or deprivation of food ration tickets; that on the day of the election plaintiff went to a school building to vote; that the officers were lined up in a row and at a desk at the end of the row was a sister of a former Secretary of War who smiled reassuringly at plaintiff as plaintiff went into the booth; that plaintiff received a ballot, marked it and cast it; that people were alarmed over the way the Communists were behaving; that Hungary realized that she was in the power of the Soviets so that all anti-Communists told one another to vote on ballot 7; that plaintiff wanted to weaken the power of the Communists; that she knew of no law in Hungary making voting compulsory; that she had not been threatened with bodily harm; that she was healthy at the time except that she lived in constant fear of the Communists; and that the Communists lost the election.

Plaintiff claims she intended to remain a citizen of the United States, and that she would not have voted in the national election in Hungary had she known it would end her United States citizenship. The evidence shows that on occasions in 1944 and 1945 she represented herself as a United States citizen.

The Court reaches the conclusion that the plaintiff voted voluntarily in the Hungarian national election. In the light of her testimony the fact that she went to the polls and voted against the Communists indicates a free will rather than the contrary. Plaintiff's action in voting was not due to any coercion exercised by the Hungarian Government or by the Communists. Indeed there is no testimony that any attempt whatever was made to have the plaintiff vote except her statement that all anti-Communists told one another to vote and that there was publicity urging people to vote. Even if plaintiff intended, as she insists, to remain a citizen of the United States, nevertheless, by virtue of the Nationality Act her expatriation took effect when she voted in the Hungarian national election.

The complaint will be dismissed.